6540

## BOWEN v. WESTERN UNION TEL. CO.

TELEGRAPH COMPANIES—MENTAL ANGUISH—PUNITIVE DAMAGES.—Failure. to be at the office of a telegraph company in a small town in which the agencies of the railroad, express and telegraph companies are combined in one person, during all the office hours on Sunday, and thereby not hearing a call for his office during morning hours, but hearing the call during afternoon hours after repeated calls, thereby preventing a father from being present at an operation upon, and the death of his daughter, which he would and could have attended, is some evidence from which the jury may infer mental anguish and wanton disregard of plaintiff's rights.
Divided Court on last point.

Before ALDRICH, J., March Term, 1906.   Affirmed.

Action by D. P. Bowen against Western Union Tel. Co. From judgment for plaintiff, defendant appeals.

*Messrs. George H. Fearons, Evans & Finley, and Bonham & Watkins,* for appellant.   *Mr. Evans* cites: *There is no evidence of punitive damages:* 73 S. C., 520; 75 S. C., 211, 182; 72 S. C., 261; 70 S. C., 261; 71 S. C., 303.   *As to granting new trials:* 64 S. C., 569.

*Mr. A. H. Dagnall,* contra, cites: *No proper request to charge, there was no evidence of wantonness, the question cannot be made now:* 72 S. C., 419, 361; 74 S. C., 136. *Point that there is no evidence to sustain a proposition must*

*be made by motion for nonsuit to direct a verdict, or by
written requests:* 36 S. C., 587; 72 S. C., 411; 74 S. C.,
102; 75 S. C., 290; 14 Ency. P. & P., 786; 75 S. C., 208.

May 16, 1907. The opinion of the Court was delivered by

MR. JUSTICE GARY. This is an action for damages,
alleged to have been sustained by the plaintiff, through the
negligence and intentional wrong on the part of the defendant, in failing to deliver within a reasonable time the
following telegram:

"Anderson, S. C., Oct. 15, 1905.
D. P. Bowen, Bowman, Ga.

Docia will have operation tonight for appendicitis. Come
at once. (Signed) R. W. Bowen."

The message was delivered to the agent at Anderson for
transmission about 8 :30 o'clock A. M., on Sunday, 15th of
October, and promptly forwarded to Augusta, Ga., the first
relay office, where it was forwarded at 8 :40 A. M. It was
then forwarded to Atlanta, Ga., the second relay office,
where it was received at 9 :30 A. M.

The agent at Atlanta made an effort to communicate
with the agent at Bowman, Ga., at 9 :45, but was unsuccessful. He again called him that afternoon at 3.55, 4 :30 and
4 :48, and succeeded in sending the message at 4 :58. It
was delivered to the plaintiff about 5 o'clock that afternoon.

The regular office hours at Bowman on Sunday were
from 8 to 10 o'clock A. M. and from 4 to 6 o'clock P. M.

The jury rendered a verdict in favor of the plaintiff for
$500.00.

The exceptions assign as error, that there was no testimony whatever tending to show that the plaintiff was
entitled either to compensatory or punitive damages.

There was testimony to the effect that Docia was the
daughter of the plaintiff; that she was critically ill at the
time the message was delivered for transmission, and that

she died about 1 o'clock P. M. next day; that he would and could have gone to her bedside before she died, if the message had been promptly delivered; and that he did reach Bowman on Monday afternoon after her death. This testimony was susceptible of the inference, by the jury, that the plaintiff suffered mental anguish and was entitled to compensatory damages.

We will next consider whether there was any testimony tending to show that the plaintiff was entitled to punitive damages. The length of time the message remained in the relay offices at Augusta and Atlanta was not only fully explained, but was not of sufficient duration as the basis for the inference of a reckless disregard of the plaintiff's rights.

In so far as the non-delivery of the message from 10 o'clock A. M., till 4 o'clock P. M. is relied upon, it is explained by the fact that the office at Bowman was not open all day Sunday, but only during the hours hereinbefore mentioned, to wit: from 8 to 10 A. M. and from 4 to 6 P. M. The failure of the agent at Bowman to receive the message on Sunday morning is thus explained by him:

"Q. What is your business, and what was it on the 15th day of last October? A. Railroad agent at Bowman and manager of the Western Union Telegraph office. Q. What is the size of Bowman, Georgia? A. Well, sir, about four hundred, somewhere along there. Q. Who is agent for the Southern Express Company there? A. I am, sir. Q. You are the agent for the Southern Railroad and the Southern Express Company and operator also? A. Yes, sir. Q. With whom is your appointment made, with the the railroad or the telegraph company? A. With the railroad. Q. And you are paid by whom? A. By the railroad. Q. Your arrangement as to telegraphing is an arrangement that you don't make direct, but it is made by the railroad and the Western Union Telegraph Company? A. Yes, sir. Q. Can you tell us, or give us an idea, as to the number of messages of this character that reaches your office per day, or the number of the messages outside of the railroad busi-

ness? A. At that time, during the work days, a good many messages were received, commercial messages, about cotton and one thing and another. Q. How about messages of this character being received on Sunday? A. It is very seldom that anything of that sort is sent on Sunday. On Sundays we don't receive any messages at all. Q. What are your hours at that office on Sundays? A. Well, sir, we generally go there every morning about 9 o'clock, and sometimes a little before that, and when the train passes we leave. Q. What is the time the train passes there? A. 9:30 is the schedule time. Q. How long did it take you on Sundays usually to attend to your telegraph business at your office? A. It didn't take me but a few minutes. Sometimes I didn't spend a minute there; didn't have anything to do. Q. I believe you stated that it was a rare thing for a message to come there on Sundays? A. Yes, sir, to receive any kind of message. Q. What time did the train arrive in the morning? A. 9:30, Eastern time, from Elberton to Toccoa. Q. What time do you keep? A. Eastern time. Q. What time is the train due there in the afternoon? A. 6:30. Q. It was due there at 6:30 in the afternoon at this time? A. Yes, sir. Q. What time did you open the office in the afternoon to receive and transmit messages? A. I didn't have any particular time then. I opened at 5 o'clock that evening. Q. You always went out there and opened the office to meet the train which was scheduled to arrive there in the morning at nine something, and in the afternoon about six? A. Yes, sir. Q. Were there any other trains passing there then? A. No, sir; not that day. * * *"

### Cross-examination.

"Q. At what time did the train go to Toccoa? A. It passes Bowman at 9:36. Q. When does it leave? A. That is the leaving time, 9:36. Q. And just the time that that train left, you pulled out and didn't stay any longer? A. I don't think I did. Q. Can you telegraph yourself at all?

A. Yes, sir, some.   Q. What is your speed?   A. Well, I have been where I could get twelve or fifteen words.   Q. Could you telegraph at all at that time?   A. Yes, sir; some. Q. Very little?   A. Yes, sir; very little.   Q. Could you have received that message?   A. I have not tried it in two or three years.   Q. You could not have received the message if they had called you?   A. I could by worrying with it.   Q. Could you have received that message if they had called you from Atlanta?   A. I don't know that I could; I had not tried it in some time.   Q. Isn't it a fact that your son did the telegraphing for you, and he was not there that morning?   A. I didn't say I took it.   Q. He was away from there, your son, and he did the telegraphing for you, and he was away from there?   A. Yes, sir.   At 9:36 he was there.   He is always there at that time.   Q. Where was he when Atlanta called?   A. I don't know, sir.   Q. Isn't all that you know about telegraphing, is when they call there you know the call, and then you go out and look for your son to come and take the message?   A. I have done that.   Q. You did it on this occasion?   A. No, sir. Q. You were not there?   A. No, sir.   Q. If you and your son had been there at 9:45, you would have gotten this message, and neither one of you were there at 9:45?   A. We were there to meet the train.   Q. Can you receive a message now?   A. I have not tried in a year or two.   Q. Who is operator for you now?   A. A young man by the name of Hunter.   Q. All you knew about telegraphing was when a call would come, you knew the call and you would go out and look your son up?   A. A lot of times he would be out of the house and I would go and look for him.

"Mr. Watkins: You knew when he called for Bowman? A. Yes, sir; I knew that as well as any man, don't care who he is.

"Mr. Dagnall: You stated that you didn't have any regular office hours?   A. No, sir; when the train would pass, we would shut up and go to the postoffice and get our mail, if there was any there, or I would; I don't know where he

would go. Q. How much does the telegraph company pay you for what you do? A. I get ten per cent. of the receipts of the office, and sometimes that is very little."

It thus appears that Bowman is a small village of about 400 inhabitants; that scarcely any business is transacted by the defendant on Sunday; that the operator at Bowman was also agent for the railroad company and for the express company; that at the time the operator at Atlanta endeavored to communicate with him on Sunday morning he was very likely discharging one of his other duties. The case of *Doster* v. *Tel. Co., ante* 56, shows that such facts are to be considered in determining whether there was a reckless disregard of the rights of others in the particular case.

We are unable to discover any facts in the record from which it could be reasonably inferred that there was a reckless disregard of the plaintiff's rights, and there was error on the part of his Honor, the presiding Judge, in refusing to grant a new trial on this grond.

I think the judgment of this Court should be, that the judgment of the Circuit Court be reversed and the case be remanded for a new trial.

MR. CHIEF JUSTICE POPE *concurs.*

MR. JUSTICE JONES *dissenting.* I am unable to concur in the conclusion that there should be a reversal on the ground that there was no evidence whatever of a wilful breach of duty on the part of defendant.

The case falls close to the dividing line between negligence which is gross and misconduct which is so reckless and disregardful of duty as to imply wilfulness, but I think it was properly submitted to the jury, and the refusal of the trial Court to disturb the verdict should not be held error.

This Court has sustained the right of a telegraph company to establish reasonable office hours and will ordinarily exonerate it from any duty to transmit and deliver messages

at other than such reasonable hours, but when reasonable hours are established certainly those who deal with the company have the right to expect careful attention to duty within such hours. It appears that the office hours at Bowman on Sunday were from 8 to 10 A. M. and 4 to 6 P. M. The fact that the office at Bowman does not handle many messages on Sundays may show the reasonableness of the hours adopted, but it does not excuse a wanton neglect on the part of defendant's agent to give attention to his duty during these hours. The evidence shows that the agent at Bowman gave very little attention to the established office hours. It appears that he went to the office about 9 o'clock A. M. and left a few minutes after 9:30 A. M., and it was for this reason that the call from Atlanta at 9:45 A. M. was unavailing. Atlanta did not call Bowman again until that afternoon, when after repeated calls the message was finally received at Bowman at 4:58. So that the explanation for the long delay in transmission is not the existence of reasonable office hours, but that defendant's agent at Bowman could not receive the message before he did because he was absent from his post of duty, in violation of the regulation of the company as to office hours. Whether defendant was wantonly disregardful of its duty to plaintiff was to be determined not merely by the conduct of its transmitting agent, but also by the conduct of its receiving agent. The evidence shows this is a stronger case for punitive damages than *Doster* v. *Tel. Co., ante* 56.

The judgment of the Circuit Court stands affirmed.

Mr. Justice Woods *concurs.*